Filed 6/15/15  P. v. Mammoth CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050924 |
| v. | (Super. Ct. No. RIF1300887) |
| MICHAEL MAMMOTH, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Eric G. Helgesen, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part, reversed in part, modified and remanded.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Michael Mammoth was sentenced to 137 years to life in prison for sexually abusing his adopted daughter Jane Doe. On appeal, he contends there is insufficient evidence he used force during the alleged acts, and the trial court prejudicially erred in admitting into evidence his pretrial confession to the police and an erotic story that was found on his cell phone. Appellant also argues the trial court erred in denying his request for a new attorney prior to sentencing and imposing various fines. We agree with appellant that some of his fines were unauthorized and that a remand is required to determine whether he has the ability to pay certain fines. In all other respects, we affirm the judgment.

FACTS

Appellant and his wife adopted Doe when she was three years old. Two years later, when Doe was five, appellant started to molest her. The first incident occurred in appellant's bedroom. After he called her into the room and closed the door, he told her to take off her clothes for "play time." Doe was scared, but she obeyed because appellant was her father and she felt she had to do what he said. Appellant rubbed Doe's breasts and touched her vagina with his hands and penis. After ejaculating, he told her not to tell anyone about what he did and sent her off to play. Doe kept quiet about the incident because she was frightened and because she did not think anyone would believe what appellant had done to her.

Doe, who was 13 years old at the time of trial in 2013, could not remember how many times appellant molested her in this fashion. However, she testified the above acts occurred at least twice a year from the age of five until she was eleven or twelve years old. On some occasions, appellant also licked and kissed Doe's vagina and buttocks, and other times he put his penis "up [her] butt." During the times appellant sodomized Doe, she often tried to push him away because the penetration was very painful, but appellant held her and pulled her closer to him.

2

Appellant also took photos of Doe during some of the episodes. He would have her pose seductively and slowly take off her clothes while snapping pictures of her. Although Doe did not like when appellant photographed or touched her, she went along with it because she was "really scared" and did not want to fight with him.

In addition to the foregoing, appellant made Doe lick and suck his penis on numerous occasions. Doe was six years old when this first occurred. After appellant took her into his bedroom, he sat her down on the bed, lowered his pants and told her what to do. Fearful appellant was going to hurt her if she refused, Doe reluctantly complied. Over the next five years, appellant made her orally copulate him at least ten times. On those occasions, Doe often tried to push appellant away from her so she could breathe, but he would not relent. Instead, he grabbed Doe's body and pulled her closer to him.

Doe never reported appellant to the police because she did not want to be taken away from the family or have appellant go to jail. However, when she was 11 years old, she told a friend about what appellant had been doing to her. The friend told her mother, who notified the authorities, and that led to a formal police investigation. When interrogated by detectives, appellant initially denied any wrongdoing. But over the course of the interview, appellant eventually admitted fondling Doe's breasts and vagina and taking erotic pictures of her. While denying he was a sexual predator or wanted to "deflower" Doe, appellant admitted he slightly penetrated her vagina on one occasion and touched her anus with his penis and ejaculated during some of the episodes. When the interview was over, appellant wrote an apology letter to Doe and gave the police consent to search his belongings. On appellant's cell phone, investigators found numerous naked photos of Doe and an erotic story about incestuous/underage rape.

At trial, defense counsel did not present any evidence on appellant's behalf. Counsel's theory of the case was that while appellant may have molested Doe, he did not victimize her to the extent and degree she asserted. In support of her theory Doe was exaggerating what happened, defense counsel got Doe to admit on cross-examination that she sometimes gets in trouble for lying and fighting. Doe also admitted she started attending counseling when she was seven years old and was currently taking Lexapro and Abilify, which are used to treat psychosis, anxiety and depression. The prosecution argued Doe's behavioral problems were attributable to the fact appellant molested her for so many years.

The jury deliberated for roughly two hours. It convicted appellant of five counts of aggravated sexual assault on a child in the form of forcible sodomy (Pen. Code, § 269, subd. (a)(3));[1] two counts of aggravated sexual assault on a child in the form of forcible oral copulation (§ 269, subd. (a)(4)); five counts of sodomizing a child under ten years old (§ 288.7); ten counts of forcible lewd conduct with a child (§ 288, subd. (b)(1)); and one count of possessing child pornography (§ 311.11, subd. (a)).

Following the verdict, appellant wrote the court a letter in which he assailed his trial attorney for failing to present sufficient evidence of Doe's "mental problems." He asked the court to appoint him a new attorney for the purpose of preparing a motion for a new trial, but the court denied the request after conducting a hearing on the matter. (See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) The court did subsequently grant appellant's motion to dismiss the counts involving sodomy with a child under 10, due to instructional error. However, even without those counts, appellant's sentence amounted to 137 years to life in prison.

---

[1] Unless noted otherwise, all further statutory references are to the Penal Code.

4

DISCUSSION

*Sufficiency of the Evidence*

Appellant contends there is insufficient evidence to support the jury's finding he forcibly molested Doe. We disagree.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence . . . from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In so doing, we do not reweigh the evidence or reevaluate the credibility of the witnesses who testified at trial; rather, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Ibid.*) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

By their terms, most of the offenses for which appellant was convicted required proof that, in committing the proscribed acts, he used force, violence, duress, menace, or fear of immediate and unlawful bodily injury against Doe. (§§ 288, subd. (b)(1) [forcible lewd conduct], 269, subds. (a)(3) & (4) [defining aggravated sexual assault to include forcible sodomy and forcible oral copulation].) Force, in this context, means physical force that is "'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.'" (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13.)

5

As appellant points out, a few courts have ruled that "[s]ince ordinary lewd touching often involves some additional physical contact, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.'" (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1004; accord, *People v. Senior* (1992) 3 Cal.App.4th 765, 774.) However, as we explained in *People v. Alvarez* (2009) 178 Cal.App.4th 999, this approach "has been criticized for attempting 'to merge the lewd acts and the force by which they were accomplished *as a matter of law.*' [Citation.]" (*Id.* at p. 1004.)

"More particularly, it has been noted that [this approach] fails to recognize a 'defendant may fondle a child's genitals without having to grab the child by the arm and hold the crying victim in order to accomplish the act. Likewise, an assailant may achieve oral copulation without having to grab the victim's head to prevent the victim from resisting.' [Citation.] Lewd conduct of this sort is punishable in and of itself. (§ 288, subd. (a).) Therefore, it stands to reason that the force requirement will be deemed satisfied when the defendant uses any force that is 'different from and in excess of the type of force which is used in accomplishing similar lewd acts with a victim's consent.' [Citation.]" (*People v. Alvarez, supra,* 178 Cal.App.4th at pp. 1004-1005.)

"According to the majority of courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves. (See, e.g., *People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161 ['defendant's acts of overcoming the victim's resistance to having his pants pulled down, bending the victim over, and pulling the victim's waist towards him' constituted forcible lewd conduct]; *People v. Neel* [(1993)] 19 Cal.App.4th [1784,] 1790 ['defendant's acts of forcing the victim's head down on his penis when she tried to pull away and grabbing her wrist, placing her hand on his penis, and then "making it go up and down"' constituted forcible lewd conduct]; *People v. Babcock* [(1993)] 14 Cal.App.4th [383,] 388 [force element met where defendant grabbed the victims' hands and made them touch his genital area].)" (*People v. Alvarez, supra,* 178 Cal.App.4th at p. 1005.)

We continue to believe this is the correct approach in analyzing the issue of force in child sex crime cases. And on the record before us in this case, we are convinced there is sufficient evidence of force to justify the jury's verdict. Doe testified she tried to push appellant away from her while he was sodomizing her and making her suck his penis. However, appellant grabbed her and pulled her closer to him against her will. This was sufficient to meet the standard we discussed in *Alvarez*.

Moreover, Doe testified she kept appellant's abuse a secret and acquiesced to his sexual demands because he was her father, he told her not to tell anyone, *and she was afraid what might happen if she did*. Being adopted, Doe was particularly concerned what would become of her if she told anyone what appellant was doing to her. It is clear Doe was a "vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority," and "[h]er compliance was derived from intimidation and the psychological control he exercised over her and was not the result of freely given consent." (*People v. Cochran, supra,* 103 Cal.App.4th at pp. 15-16, fn. omitted.) Thus, even if the force requirement were lacking, we would uphold appellant's convictions on the theory he accomplished his crimes by means of duress. (*Ibid.*; *People v. Veale* (2008) 160 Cal.App.4th 40, 46-47; *People v. Pitmon* (1985) 170 Cal.App.3d 38, 50.) From a sufficiency-of-the-evidence standpoint, there is simply no reason to disturb the jury's verdict.

*Admissibility of the Erotic Story*

Appellant contends the trial court prejudicially erred by admitting into evidence the erotic story that was found on his cell phone. He argues the story should have been excluded because it was irrelevant, protected under the First Amendment and unduly prejudicial, but we find its admission is not cause for reversal.

The story is a 16-page fictional tale written from the perspective of a pedophile named John, who is in charge of a slumber party for his 12-year-old daughter and her four female friends. The story recounts how John is able to manipulate the girls

7

into having sex with him and each other, after he slips a modified form of the drug Ecstasy into their sodas. The sexual activity is described in very graphic detail. It includes multiple instances of rape, sodomy and oral copulation, as well as the use of a "double-dildo," a "strap-on" and numerous "ball gags." The underlying theme of the story is that, although the sex is uncomfortable and painful for the girls at first, they soon come to enjoy it and are left wanting more after the effect of their drugs wears off.

Before trial, defense counsel moved to exclude the story under Evidence Code section 352.[2] While admitting the story was relevant to show appellant's sexual interest in children, defense counsel argued that was not really a disputed issue, given appellant's confession and Doe's testimony about what appellant did to her. Therefore, defense counsel urged the court to exclude the story as cumulative and unduly prejudicial. The prosecutor contended the story was relevant to appellant's intent and to give the jury a full understanding of the case. He also argued the story was less inflammatory than the charged offenses because it related to purely fictional events as opposed to actual child molestation.

In ruling on the matter, the trial judge stated he had reviewed the story, but did not read it "all the way through." He told counsel, "I got the gist, I think, of what's there." Ultimately, the judge determined the story was admissible to show appellant's intent in touching Doe. While the court permitted the jury to consider the story for that purpose, it specifically instructed the jury that it could not use the story for any other purpose, such as inferring appellant had a bad character or was criminally inclined.

---

[2] Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

That instruction was important because the law generally does not allow prosecutors to bring up a defendant's past for the purpose of impugning his character or suggesting he is predisposed to commit crimes. (Evid. Code, § 1101, subd. (a).) However, a defendant's uncharged acts may be admitted for other purposes, such as proving the intent with which he carried out the acts in question. (*Id.*, subd. (b).) And while the trial court may exclude evidence of uncharged acts if its relevance is substantially outweighed by its prejudicial effect (Evid. Code, § 352), the court has broad discretion in this area: Its "exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

In trying to make such a showing, appellant reiterates his claim that his confession and the manner in which he allegedly touched Doe firmly established the requisite lewd intent for the charged offenses, and therefore the erotic story added little if anything to that issue. However, the fact appellant effectively conceded the issue of intent at trial does not mean the issue was off the table. "'[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.' [Citation.]" (*People v. Rogers* (2013) 57 Cal.4th 296, 330.) While the evidence of appellant's intent was quite strong – even without the erotic story – "the prosecution had the right to present all available evidence to meet its burden of proving the requisite mens rea for [the alleged crimes] beyond a reasonable doubt. [Citations.]" (*Ibid.*) That logically included the erotic story, which was relevant because it strongly suggested appellant had a sexual attraction to young girls. (*People v. Memro* (1995) 11 Cal.4th 786, 864-865 [upholding admission of photographs and magazines depicting unclothed youths as evidence of the defendant's lewd intent]; *People v. Bales* (1961) 189 Cal.App.2d 694, 701 [same].)

9

Appellant also challenges the admissibility of the erotic story on First Amendment grounds.[3] However, appellant was not convicted for possessing the erotic story. In fact, the prosecutor admitted there was nothing inherently illegal about appellant having the story on his cell phone. The prosecutor used the story only as *circumstantial* evidence of appellant's intent. (See generally *People v. Pitts* (1990) 223 Cal.App.3d 606, 835 ["a prior act need not be a crime to be admissible under Evidence Code section 1101"].) In arguing the impropriety of this strategy, appellant relies on *Guam v. Shymanovitz* (9th Cir. 1998) 157 F.3d 1154, 1158-1159, which questioned the link between the possession of reading materials about deviant sexual conduct and the possessor's willingness to engage in such conduct. However, *Shymanovitz* was overruled in *United States v. Curtin* (9th Cir. 2007) 489 F.3d 935, 953-956 (*Curtin*), which held the First Amendment does not preclude the admission of such reading materials when they are circumstantially relevant to an issue in the case, such as intent. We agree with *Curtin* that a criminal defendant cannot "use the First Amendment or any other constitutional principle to exclude relevant evidence . . . on the specific ground that the evidence is 'reading material' or literature otherwise within constitutional protection in another setting." (*Id*. at p. 955.) Because the erotic story was probative of appellant's intent in touching Doe, it was not barred by the First Amendment.

However, we do agree with appellant that the trial court abused its discretion from a procedural standpoint by failing to read the erotic story in its entirety before ruling on its admissibility.

In determining whether evidence is subject to exclusion under Evidence Code section 352, the trial court must balance its probative value against its prejudicial effect. When, as here, the subject evidence involves written materials, the court "must know precisely what is in the [materials] in order for its weighing discretion to be

---

[3] Although appellant did not object to the story on this basis in the trial court, we will consider his First Amendment claim because he alleges his attorney was ineffective for failing to raise it below.

10

properly exercised and entitled to deference on appeal." (*Curtin, supra*, 489 F.3d at p. 957.) A court cannot properly exercise its balancing discretion if it "fails to place on the scales and personally examine and evaluate *all* that it must weigh" for the simple reason that "[o]ne cannot evaluate . . . what one has not seen or read." (*Id.* at p. 958.)

*Curtin* illustrates the danger of failing to read proffered written materials in their entirety before ruling on their admissibility. In that case, the trial court permitted the prosecution to introduce into evidence five fictional stories that were found in the defendant's possession following his arrest for crossing states lines for the purpose of having sex with a minor. The stories, which were about adults having sex with children, were admitted to show the defendant's lewd intent, but because the trial court read only "'snippets'" of the stories, it failed to discover that one of them contained a graphic description of a girl "engaged in sexual acts of mutual oral copulation with, and masturbation of, a dog." (*Curtin, supra*, 489 F.3d at p. 957.) Because this part of the story was "both irrelevant and dangerously prejudicial," the Ninth Circuit Court of Appeals reversed the defendant's convictions and remanded the matter for a new trial. (*Id.* at pp. 957-959.)

*Curtin* is distinguishable from the case at hand. The problem with the story in *Curtin* was that it referred to sexual activity in the form of bestiality that had nothing to do with the charged offenses and signaled the defendant's deviant desires transcended the intent to have sex with minors. By contrast, the story found on appellant's phone was strictly about an adult having sex with minors. There were no unknown passages about other types of deviant sexual activity lurking in the story that carried the potential for undue prejudice. In fact, the opening paragraphs make clear what the entire story is about: A father's sadistic fantasy about "drugging and raping" his daughter and her friends at a slumber party. The detailed sexual descriptions that follow are somewhat

11

repetitive and do not deviate from that basic story line. We do not believe the trial judge's ruling would have been any different had he read the entire story word for word.

Nor do we believe it is reasonably probable appellant would have obtained a more favorable verdict had the story been excluded altogether. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In arguing prejudice, appellant asserts that given its graphically salacious nature, the jurors could not have possibly limited their consideration of the erotic story to the issue of intent, as the trial court instructed them to do. Rather, they would have construed the story more broadly as a reflection of appellant's deviant character and been inclined to convict him for harboring offensive thoughts – a violation of due process. But as a reviewing court, we presume, absent indications to the contrary, the jury followed the trial court's instructions. (*People v. Jones* (2011) 51 Cal.4th 346, 371.) And there is nothing in the record that suggests the jury ignored the judge's instruction to consider the erotic story solely for the purpose of ascertaining appellant's intent.

Moreover, the trial court took pains to ensure the story did not receive undue attention at trial. It did allow the prosecutor to mention the story in opening and closing argument (again, simply for purposes of establishing appellant's intent) and to present evidence as to how the story was recovered from appellant's cell phone. But it did not allow the prosecutor to read the story or elicit extensive testimony regarding its contents, so it was mentioned only briefly at trial. In comparison, the jury heard extensive evidence from Doe about how appellant forced her to engage in a variety of sexual acts. Given Doe's testimony in this regard, it is unlikely the jury was unable to handle the evidence about the erotic story. We do not believe the story was unduly prejudicial or violative of due process, in light of the charges appellant faced and the jury instructions that were given.

Finally, the record shows that even without the erotic story, the prosecution's case against appellant was very strong. Indeed, trial counsel's argument

12

against admission of the story was that his client had already confessed and the combination of that confession and Doe's testimony made the case so strong the story was cumulative – legalese for piling on. Not only did Doe testify in detail about how appellant molested her, appellant had naked photos of Doe on his cell phone, and he admitted to the police that he had molested Doe. The evidence of appellant's guilt was so overwhelming that any error in admitting the erotic story was harmless under any standard of review.

*Admissibility of Appellant's Confession*

Appellant next contends the trial court erred in denying his motion to suppress his pretrial confession. He argues his confession was inadmissible because he did not knowingly and intelligently waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), but the record shows otherwise.

Appellant was interviewed by the police on the evening of February 5, 2013. The record does not reveal how he got to the police station, but when he arrived there, he had to wait in an interview room about two and a half hours while the police spoke to his wife and Doe. It was 9:00 or 10:00 p.m. by the time investigators Jennifer Cole and Edmond Seltzer got around to questioning him. However, according to Seltzer, appellant appeared perfectly alright; he did not seem to be physically tired or mentally fatigued.

After apologizing to appellant for keeping him waiting, the investigators informed him they had already talked to his wife and Doe. Cole then obtained various background information from appellant, including his past and present addresses, date of birth and phone number. She also asked him about his employment, and he said he had worked at a church the past three years. At that point, Cole told appellant they had a lot to talk about, but before they could proceed, she needed to read him his *Miranda* rights. Cole informed appellant he had the right to remain silent, anything he said could be used

13

against him in court, he had the right to have an attorney present during questioning, and if he could not afford an attorney, one would be appointed to him. When Cole asked appellant if he understood these rights, he said yes.

Without asking appellant if he wanted to waive his rights and continue the interview, Cole proceeded to ask appellant why he thought she wanted to talk to him. Appellant said he did not know, but surmised it had something to do with a cyber-bullying incident Doe was involved in. Cole told appellant that was not the case and that she wanted to ask him about certain allegations Doe had made about him touching her inappropriately. Appellant replied, "Oh, my god" and asked, "What do you want to know?" Cole said she simply wanted to know the truth. At first, appellant denied any wrongdoing, but as the interview wore on, he admitted having sexually molested Doe on about 10 or 12 occasions over the years.

Appellant argues his confession was inadmissible because the investigators did not ask him if he wanted to waive his *Miranda* rights and he did not expressly agree to do so. However, waivers come in many forms. While it has long been recognized that the better practice is for the police to obtain an express waiver from the suspect, "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (*North Carolina v. Butler* (1979) 441 U.S. 369, 373, fn. omitted.) Indeed, "'[o]nce the defendant has been informed of his [*Miranda*] rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them.'" (*People v. Whitson* (1998) 17 Cal.4th 229, 248, quoting *People v. Johnson* (1969) 70 Cal.2d 541, 558, disapproved on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8.)

While appellant was reluctant to admit what he did to Doe, he never objected to being interviewed or requested an attorney. Nor did he express any confusion

14

about what his rights were or what the investigators were asking him. Throughout the interview, his answers were generally on point and quite articulate as a whole. After admitting he was a "computer guy," he was even able to explain in considerable detail the operational aspects of the various computers he had at his house. It would thus seem reasonable to conclude that, by acknowledging he understood his *Miranda* rights and then proceeding to answer the investigators' questions, appellant voluntarily, albeit impliedly, waived those rights. (*People v. Whitson, supra,* 17 Cal.4th at pp. 247-250; *People v. Medina* (1995) 11 Cal.4th 694, 752; *People v. Sully* (1991) 53 Cal.3d 1195, 1233; *People v. Davis* (1981) 29 Cal.3d 814, 823-826; *People v. Nitschmann* (1995) 35 Cal.App.4th 677, 680-683.)

In arguing to the contrary, appellant notes that prior to this case, he had no experience with the criminal justice system. Appellant suggests his lack of prior arrests made it impossible for him to understand the full import of his *Miranda* rights when Cole read them to him. However, the rights – four simple admonishments – are not particularly complicated. In fact, they are so well known they "have become part of our national culture." (*Dickerson v. United States* (2000) 530 U.S. 428, 430.) And while appellant complains Cole did not immediately start questioning him about the allegations after she admonished him, we fail to see how this pertains to the waiver issue. There is nothing in the record to suggest appellant did not comprehend what was going on or what the consequences of his continuing to speak with the investigators would be.

Relying on *People v. Honeycutt* (1977) 20 Cal.3d 150, appellant also accuses the investigators of manipulating him in a manner that was designed to undermine his *Miranda* rights. In *Honeycutt*, the California Supreme Court found the defendant's *Miranda* waiver involuntary because it resulted from "clever softening-up" by the police. (*Id*. at p. 160.) In particular, the court was troubled by the fact that, before

15

obtaining the defendant's waiver, the investigating officer spent half an hour ingratiating himself to the defendant by disparaging the victim and talking about unrelated events. (*Id*. at pp. 158-160.)

Here, in contrast, the investigators simply obtained some basic background information from appellant before advising him of his rights. Judging by the fact the advisement appears on the fifth page of the interview transcript, it could not have come much more than a minute or two into the interview. Under these circumstances, appellant's reliance on *Honeycutt* is sorely misplaced. There is nothing in that opinion or the record below which undermines the trial court's conclusion appellant voluntarily waived his *Miranda* rights before confessing to his actions.

*Marsden Claim*

Appellant contends the trial court abused its discretion and violated his Sixth Amendment right to counsel by denying his request for a new attorney following the verdict. We do not see it that way.

On the eve of sentencing, appellant sent the trial judge a letter asking to have deputy public defender Melissa Hale removed as his attorney and to have another attorney appointed in her stead. In the letter, appellant alleged Hale was remiss for failing to present additional evidence regarding Doe's mental health problems. While admitting Hale had elicited evidence Doe was in counseling and taking various medications to improve her mental well-being, appellant claimed Hale should have presented evidence from Doe's medical records and her current psychiatrist and therapists to shed light on why she accused him of molesting her. In his letter, appellant also faulted Hale for conceding he was guilty of some of the lesser included offenses which did not require the use of force or fear. Appellant took this as a sign Hale was working in collusion with the prosecution and not looking out for his best interests in the case.

16

At the *Marsden* hearing, appellant reiterated his claims about Hale's trial tactics. He also alleged Hale had only met with him on one occasion prior to trial, and that was merely to go over the charges, not to discuss strategy or what evidence to present at trial. Appellant further claimed he had newly discovered evidence from Doe's Facebook page that proved she was delusional.

In response to appellant's allegations, Hale explained that while she subpoenaed all of Doe's mental health records, she did not present them at trial for two reasons. First, the records showed Doe's mental health problems developed after the alleged molestation occurred, which suggested they were attributable to the molestation. And second, although appellant thought Doe had reactive attachment disorder, which might explain why she would falsely accuse him of molesting her, Doe's records did not bear that out. In fact, they were consistent with a person who had actually been molested.

In defending her trial tactics, Hale further explained that the reason she conceded appellant's guilt on some of the lesser included offenses is because appellant confessed to molesting Doe, and if the jury only convicted him of the lesser offenses, he might not get a life sentence. As far as her contacts with appellant were concerned, Hale said she met with him in jail before trial for several hours and explained all aspects of the case to him at that time, including the feasibility and pitfalls of presenting evidence regarding Doe's mental health. Hale said she also met appellant during the trial to discuss whether he should testify on his own behalf. Although Hale wanted appellant to take the stand, he ultimately decided not to do so. After hearing Hale's side of the story, the trial court did not believe there were grounds for appointing a new attorney. Therefore, it denied appellant's *Marsden* motion.

In *Marsden,* our Supreme Court ruled, "[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court . . . ." (*Marsden, supra*, 2 Cal.3d at p. 123.)

17

Unless "'the record clearly shows that the first appointed counsel is not adequately representing the accused'" and that the failure to appoint other counsel would "'substantially impair or deny'" the defendant's right to counsel, the trial court is not required to accede to the defendant's request for a new attorney. (*Ibid.*) In other words, a defendant is entitled to a new attorney only "if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such irreconcilable conflict that ineffective representation is likely to result." (*People v. Smith* (2003) 30 Cal.4th 581, 604.)

Appellant argues Hale's decision to concede the lesser included offenses and her failure to present any affirmative evidence on his behalf proves she did not represent him in a proper and meaningful fashion. However, appellant is the one who decided not to take the stand. Although Hale wanted him to testify in an attempt to minimize his actions, appellant saw this as tantamount to admitting his guilt. But by the time of trial, appellant had already confessed to the police about molesting Doe, so the cat was already halfway out of the bag. Under these circumstances, it was entirely reasonable for Hale to concede appellant's guilt on some of the lesser counts in an attempt to spare him a life sentence.

Hale was also wise to avoid getting too deep into Doe's mental history, given Doe's records indicated that she *had been* molested and that her mental problems manifested *after* appellant molested her. In fact, just as Hale feared, the prosecution used the latter point to argue appellant's actions were the cause of Doe's problems. And while appellant complains about a breakdown in communication between him and his attorney, Hale said she went over the case in detail with appellant before the trial. It is clear that appellant simply disagreed with her about how to go about defending the charges and that Hale did the best she could do with the hand she was dealt. Appellant's disagreement

18

with Hale about certain tactical issues was not grounds for appointing him a new attorney. (*People v. Streeter* (2012) 54 Cal.4th 205, 231.) The trial court did not abuse its discretion or violate appellant's right to counsel by failing to do so.

*Appellant's Fines*

At sentencing, the trial court fined appellant $70 for committing rape (§ 264, subd. (b)) and $8,800 for committing certain other sex offenses (§ 290.3, subd. (a)). It also ordered appellant to pay a $5,000 restitution fine pursuant to section 1202.4. Appellant's arguments regarding these fines require little discussion.

First, it is undisputed appellant's $70 fine for committing rape must be stricken because he was not convicted of that offense. Second, although appellant contends he should have been granted a jury trial on the amount of his restitution fine, it is clear he forfeited this claim by failing to raise it below (*People v. Scott* (1994) 9 Cal.4th 331, 353), and the claim lacks merit in any event because the court selected a fine that is within the statutorily prescribed range. (§ 1202.4, subd. (b)(1) [authorizing restitution fine up to $10,000]; *People v. Kramis* (2012) 209 Cal.App.4th 346, 351-352.)

As for the $8,800 fine imposed pursuant to section 290.3, the parties agree that fine must be reduced to $6,500 because the evidence fails to establish that 12 of the counts appellant was convicted of (counts 6, 7 and 13 through 22) occurred after 2006, which is when the Legislature increased the fines prescribed under section 290.3. (See *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248 [ex post facto principles require fines imposed under section 290.3 to be calculated based on the date of the defendant's crimes, not his sentencing hearing].) At the same time, the parties also agree the trial court erred in failing to impose certain financial penalties and surcharges that are mandated under sections 1464 and 1465.7 and Government Code sections 76000 and 70372. (See *People v. Valenzuela, supra,* 172 Cal.App.4th at p. 1249.) While the Attorney General requests we simply modify the judgment to reflect the imposition of

19

these penalties and surcharges – which allegedly total upwards of $10,000 – a hearing is required to determine whether appellant has the financial ability to pay them. (*Id*. at pp. 1249-1250.) We will therefore remand the matter for that limited purpose. (*Ibid*.)

DISPOSITION

Appellant's $70 fine imposed under section 264, subdivision (b) is reversed. Appellant's $8,800 fine imposed under section 290.3, subdivision (a) is modified to $6,500. The matter is remanded for the trial court to determine whether appellant has the financial ability to pay any other financial penalties or surcharges that are applicable in this case. In all other respects, the judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.

20